# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| **MARJORIE THOMPSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 4:17-cv-01932-MHH** |
| | } | |
| **ANDREW SAUL, Commissioner of** | } | |
| **the Social Security Administration,**[1] | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 405(g), plaintiff Marjorie Thompson seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Thompson's claims for period of disability and disability insurance benefits. After careful review, the Court remands the Commissioner's decision.

---

[1] The Court asks the Clerk to please substitute Andrew Saul for Nancy A. Berryhill as the proper defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d) (When a public officer ceases holding office that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

# I. PROCEDURAL HISTORY

Ms. Thompson applied for disability insurance benefits. (Doc. 6-3, p. 12; Doc. 6-4, p. 19). She alleges her disability began on March 4, 2014. (Doc. 6-3, p. 12; Doc. 6-4, p. 19). The Commissioner initially denied Ms. Thompson's claim. (Doc. 6-3, p. 12; Doc. 6-4, p. 19). Ms. Thompson requested a hearing before an Administrative Law Judge (ALJ). (Doc. 6-3, p. 19; Doc. 6-5, p. 8). The ALJ issued an unfavorable decision. (Doc. 6-3, pp. 12-33). On October 2, 2017, the Appeals Council declined Ms. Thompson's request for review (Doc. 6-3, p. 2), making the Commissioner's decision final for this Court's judicial review. *See* 42 U.S.C. § 405(g).

# II. STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r, Soc. Sec. Admin.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r, Soc. Sec. Admin.*, 363 F.3d 1155, 1158

(11th Cir. 2004). In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r, Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven disability, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Ms. Thompson meets the insured status requirements through December 31, 2018. (Doc. 6-3, p. 15). Ms. Thompson has not engaged in substantial gainful activity since March 4, 2014, the alleged onset date. (Doc. 6-3, p. 15). The ALJ determined that Ms. Thompson suffers from the following severe impairments: chronic lower back pain, meningitis, left shoulder pain, loss of visual acuity, and lower extremity neuropathy. (Doc. 6-3, p. 15).[2] Based on review of the medical evidence, the ALJ found that Ms. Thompson does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 6-3, p. 24).

The ALJ determined that Ms. Thompson has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b):

> except for no more than occasional stooping or crouching; no climbing; no lower extremity pushing or pulling; no work at unprotected heights; and no driving. She is limited to simple, repetitive, non-complex tasks; work in temperature controlled environment; no reading of fine print or materials; and no left upper extremity overhead reaching, pushing, or pulling.

---

[2] "Meningitis affects the meninges, the membranes that surround the brain and spinal cord and protect the central nervous system (CNS), together with the cerebrospinal fluid." https://www.medicalnewstoday.com/articles/9276.php (last visited Aug. 7, 2019). Neuropathy is "damage, disease, or dysfunction of one or more nerves especially of the peripheral nervous system that is typically marked by burning or shooting pain, numbness, tingling, or muscle weakness or atrophy, [and] is often degenerative[.]" https://www.merriam-webster.com/dictionary/neuropathy (last visited Aug. 7, 2019).

(Doc. 6-3, p. 26). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). The ALJ concluded that Ms. Thompson is unable to perform her past relevant work as a registered nurse or paramedic. (Doc. 6-3, pp. 30-31).

Relying on testimony from a vocational expert, the ALJ found that other jobs existed in the national economy that Ms. Thompson could perform, including cleaner, ticket taker, and cashier. (Doc. 6-3, p. 32). Accordingly, the ALJ determined that Ms. Thompson was not under a disability within the meaning of the Social Security Act. (Doc. 6-3, p. 32).

## IV.  ANALYSIS

Ms. Thompson argues that the ALJ erred in denying her application for benefits because the ALJ failed to consider the opinion of Ms. Thompson's treating neurosurgeon, Dr. Pickett; the ALJ misapplied the Eleventh Circuit pain standard; and the ALJ did not base his RFC determination on substantial evidence. (Doc. 9, p. 1). Because the ALJ failed to explain the weight he gave to Dr. Pickett's opinion and because substantial evidence does not support the ALJ's analysis of Ms. Thompson's testimony concerning her pain, the Court remands this matter for additional proceedings.

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective

symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, No. 18-11954, 2019 WL 1975989, at *3 (11th Cir. May 3, 2019). When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r, Soc. Sec. Admin.*, No. 18-11708, 2019 WL 1758438, at *2 (11th Cir. Apr. 18, 2019) (citing *Wilson*). If the ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson,* 284 F.3d at 1225; *Coley*, 2019 WL 1975989, at *3. As a matter of law, the

Secretary must accept the claimant's testimony if the ALJ inadequately or improperly discredits the testimony. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*); *see Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987) ("It is established in this circuit if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true.").

When credibility is at issue, the provisions of Social Security Regulation 16-3p apply. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. An ALJ must explain the basis for findings relating to a claimant's description of symptoms:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with

and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10. In evaluating a claimant's reported symptoms, an ALJ must consider:

(i) [the claimant's] daily activities; (ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms; (v) [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms; (vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r, Soc. Sec. Admin.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

Here, the ALJ found that Ms. Thompson's medical records and daily activities do not support her testimony regarding her pain and limitations. (Doc. 6-3, pp. 28-30). Accordingly, the Court first examines Ms. Thompson's testimony and then compares her testimony to the medical evidence in the record and to the evidence relating to her daily activities. In evaluating the medical evidence, the Court addresses the ALJ's treatment of Dr. Pickett's opinion.

*A. Ms. Thompson's Testimony*

Ms. Thompson was 49 years old when the ALJ rendered his opinion. Ms. Thompson had worked as a paramedic, a registered nurse in a neuro-intensive care unit, and an organ procurement coordinator. (Doc. 6-3, pp. 64-65). Ms. Thompson testified that after working a night shift at the hospital in March 2014, she fell asleep while driving, went down an embankment, and rolled her car three or four times. (Doc. 6-3, p. 66). Ms. Thompson suffered a burst fracture of her L1 vertebrae. (Doc. 6-3, p. 66). To repair the fracture, a surgeon inserted rods and screws into Ms. Thompson's spine. (Doc. 6-3, p. 66). Ms. Thompson reported that the surgeon removed muscle tissue from her lower thoracic and lumbar spine during her surgery. (Doc. 6-3, p. 74).

Ms. Thompson stated that she "still ha[s] all of [her] hardware" from the surgery. (Doc. 6-3, p. 78). She has "one set from T11 to L3 that's rods and screws and then . . . another one that's L5 to S1." (Doc. 6-3, p. 78). Ms. Thompson testified that the surgery has limited her ability to bend and lift. (Doc. 6-3, p. 74). Ms. Thompson indicated that she cannot lift a gallon of milk and cannot pick things up from the floor. (Doc. 6-3, p. 74).

After her spinal surgery, Ms. Thompson was diagnosed with meningitis. (Doc. 6-3, p. 66). Ms. Thompson underwent surgery to remove tissue damaged by the infection. (Doc. 6-3, p. 66). Ms. Thompson testified that she was put on an IV

antibiotic pump for 12 weeks and completed physical therapy at home. (Doc. 6-3, p. 67). Ms. Thompson stated that as a result of the antibiotic treatment, her immune system is weakened, and she has difficulty "get[ting] over stuff" and healing. (Doc. 6-3, pp. 67-68). Ms. Thompson testified that the meningitis has affected her handwriting, sight and peripheral vision, speech, and cognitive abilities. (Doc. 6-3, p. 68). She is unable to read fine print. (Doc. 6-3, p. 80).

Ms. Thompson stated that she has severe pain in her left leg and hip, and she has numbness in both of her legs and feet. (Doc. 6-3, p. 79). Ms. Thompson testified that she will be on oral pain medication for the rest of her life. (Doc. 6-3, p. 69).

Ms. Thompson suffers from headaches two to three times weekly. (Doc. 6-3, pp. 71-72). Ms. Thompson takes pain medication and lies down in a dark, quiet room to alleviate her symptoms. (Doc. 6-3, pp. 71-72). Ms. Thompson stated that the only side effect of her medication is constipation. (Doc. 6-3, p. 72).

Ms. Thompson has radicular neuropathy of her L5 vertebrae which radiates down the backside of her legs and into her feet. (Doc. 6-3, p. 69). Ms. Thompson stated that she avoids standing for three to four hours uninterrupted because her legs swell. (Doc. 6-3, p. 69). Ms. Thompson reported that she suffers from severe muscle spasms, especially in her left calf and foot. (Doc. 6-3, p. 72). She takes three different muscle relaxers. (Doc. 6-3, p. 72).

Ms. Thompson uses a cane because her left side is weak and "it feels like it's going to give out at any time." (Doc. 6-3, p. 70). Ms. Thompson stated that she has been diagnosed with arthritis, tendonitis, and inflammation of her shoulder. (Doc. 6-3, p. 70). Ms. Thompson reported that because of her mitral valve prolapse, as her pain level increases, she has chest pain and shortness of breath. (Doc. 6-3, pp. 70-71).

Ms. Thompson's ex-husband has moved back into her house to take care of her and her daughter because she is unable to do housework or drive. (Doc. 6-3, pp. 72, 76). Ms. Thompson cannot drive because she takes morphine and Percocet. (Doc. 6-3, p. 72). Ms. Thompson homeschools her daughter because they live outside the bus jurisdiction, and Ms. Thompson cannot drive. (Doc. 6-3, p. 73). Ms. Thompson stated that her ex-husband helps her shower and dress and does all of the housework. (Doc. 6-3, p. 73).

Ms. Thompson attempted to return to work in July 2014. (Doc. 6-3, p. 75). Despite accommodations and limited hours, Ms. Thompson could not perform her job and would "cry[ ] all the way home with severe pain" after a twelve-hour shift. (Doc. 6-3, p. 75). The hospital fired Ms. Thompson in August of 2014. (Doc. 6-3, p. 75).

Ms. Thompson testified that she has two to three good days a week depending on the weather; cold temperatures aggravate her symptoms. (Doc. 6-3, p. 82). On

good days, she can sit for forty-five minutes and stand for a maximum of one hour without aggravating her symptoms. (Doc. 6-3, p. 77). Ms. Thompson stated that she can walk half a block before she needs to sit down, and on good days she can lift a gallon and a half with her right arm. (Doc. 6-3, pp. 77-78). Ms. Thompson testified that on a typical day, she gets up between 10:00 and 11:00 in the morning. (Doc. 6-3, p. 81). After she makes sure her daughter is doing her schoolwork and sees if her daughter needs help, she returns to bed. (Doc. 6-3, p. 81). Ms. Thompson stated that she takes her medication around 1:00 p.m. and gets back up around 6:00 p.m. to eat dinner before returning to bed. (Doc. 6-3, p. 81). Ms. Thompson added that she usually cannot fall asleep until 3:00 a.m. because she "can't get comfortable," and she wakes up around 5:00 a.m. to take her morning medicine. (Doc. 6-3, p. 81). After that, Ms. Thompson goes back to sleep. (Doc. 6-3, pp. 81-82).

### B. Medical Records

#### 1. Ms. Thompson's Medical History

In April 2008, Dr. Banks, a neurosurgeon at the Spine & Neuro Center, performed a right-sided hemilaminotomy, foraminotomy, and discectomy on Ms. Thompson's L5-S1 region after Ms. Thompson complained of severe right lower extremity pain. (Doc. 6-16, p. 50).[3] Following her surgery, Dr. Banks wrote, "she

---

[3] A hemilaminotomy is a spine decompression operation in which "the surgeon only removes part of the lamina on the side that needs to be decompressed, preserving its basic structure. A foraminotomy is another procedure that takes pressure off the spinal nerves. In a formaninotomy,

complains of continued right lower extremity pain, actually worse than it was before, and has even missed a day of work, which is not her usual." (Doc. 6-16, p. 49). Over the next several years, Ms. Thompson saw Dr. Banks at the Spine & Neuro Center for treatment of numbness and tingling in her legs and pain in her lower back, left hip, and left and right leg. (Doc. 6-16, pp. 33-53). In August of 2010, Dr. Banks performed a lumbar laminectomy on Ms. Thompson. (Doc. 6-16, p. 59).[4]

Six years later, in March 2014, Ms. Thompson had a car accident. (Doc. 6-13, p. 24). Ms. Thompson suffered from a lumber spine L1 vertebrae burst fracture. (Doc. 6-13, p. 24).[5] Dr. Pickett performed a "decompressive laminectomy at T12

---

the surgeon removes material that is blocking the passageway where the spinal nerves go through the spinal canal. This widens the area and decompresses the spinal nerves, alleviating pain. Both of these procedures can help patients who suffer from spinal nerve compression which can cause pain, weakness and numbness." https://www.triangleortho.com/lumbar-hemilaminotomy-north-carolina.asp (last visited Aug. 16, 2019). A discectomy "is a surgery to remove a herniated or degenerative disc in the lower spine. . . . The surgeon accesses the disc by removing a portion of the lamina. The lamina is the bone that forms the backside of the spinal canal and makes a roof over the spinal cord." https://mayfieldclinic.com/pe-lumdiscectomy.htm (last accessed Aug. 16, 2019).

[4] "Laminectomy is surgery that creates space by removing the lamina — the back part of a vertebra that covers [a person's] spinal canal. . . . Laminectomy enlarges [a person's] spinal canal to relieve pressure on the spinal cord or nerves. . . . Laminectomy is generally used only when more-conservative treatments — such as medication, physical therapy or injections — have failed to relieve symptoms. Laminectomy may also be recommended if symptoms are severe or worsening dramatically." https://www.mayoclinic.org/tests-procedures/laminectomy/about/pac-20394533 (last visited Aug. 16, 2019).

[5] "A burst fracture is a descriptive term for an injury to the spine in which the vertebral body is severely compressed. They typically occur from severe trauma, such as a motor vehicle accident or a fall from a height." https://www.spineuniverse.com/conditions/spinal-fractures/burst-fractures-defined-diagnosed (last accessed Aug. 23, 2019).

through L1 with transpedicular decompression of L1 burst fracture," a "posterclateral fusion of T12 through L3 with in situ autograft, allograft, ISTO granules, and DBM," an "internal fixation and reduction of fracture using Spinal Elements pedicle screws and rods at T11 through L3," and a "transpedicular aspiration of bone marrow blood to facilitate fusion." (Doc. 6-13, p. 24).[6] Ms. Thompson tolerated the surgery well and experienced no difficulties. (Doc. 6-13, p. 24).

Ms. Thompson had a post-surgery visit with Dr. Pickett at the Spine & Neuro Center later in March 2014. (Doc. 6-16, p. 29). Dr. Pickett noted that Ms. Thompson was "doing well." (Doc. 6-16, p. 29). Dr. Pickett removed staples from Ms. Thompson's incision and noted that her incision was healing normally. (Doc. 6-16, p. 29). Ms. Thompson reported to Dr. Pickett that she was experiencing numbness and tingling sensations. (Doc. 6-16, p. 30). Dr. Pickett prescribed Percocet (one to two 10 mg-325 mg tablet every four to six hours) for pain and indicated that Ms. Thompson was "not ready to return to work as yet." (Doc. 6-16, p. 31).

---

[6] A surgeon performs a pedicle screw fixation "in conjunction with spinal fusion surgery to secure the vertebrae of the treated area in a fixed position. These devices provide stability and support to the spine after surgery and keep bone grafts in position while the spine heals. While pedicle screws provide anchor points on the spinal segment, metal rods are used to connect them together." https://www.princetonorthopaedic.com/procedures/spine/pedicle-screw-fixation/ (last accessed Aug. 23, 2019).

In April 2014, the Marshall Medical Center admitted Ms. Thompson into the intensive care unit based on her complaints of pain, decreased appetite, and confusion. (Doc. 6-9, p. 6). The Marshall Medical Center determined that Ms. Thompson had cellulitis at the site of her back incision with a large amount of drainage from the area, possible osteomyelitis, possible meningitis, altered mental status, sepsis, and possible lower lobe pneumonia. (Doc. 6-9, p. 6).[7] Ms. Thompson transferred from the Marshall Medical Center to Huntsville Hospital. (Doc. 6-9, p. 7; Doc. 6-12, p. 15).

Huntsville Hospital diagnosed Ms. Thompson with systemic inflammatory response syndrome picture, diabetes mellitus type II uncontrolled, recent back surgery for L1 compression fracture with probable hardware infection, anxiety, depression, and dehydration. (Doc. 6-12, p. 17). The notes from the first day of Ms. Thompson's admission state that as a result of her back surgery, she had low back and leg pain with "significant debility," i.e. physical weakness. (Doc. 6-12, p. 18). Dr. Pickett performed an incision and draining procedure on Ms. Thompson's back wound. (Doc. 6-12, p. 19). The procedure relieved some of Ms. Thompson's pain. (Doc. 6-12, p. 22).

---

[7] Cellulitis "is a common, potentially serious bacterial skin infection." https://www.mayoclinic.org/diseases-conditions/cellulitis/symptoms-causes/syc-20370762 (last visited Aug. 23, 2019).

Ms. Thompson developed a Staphylococcus infection and meningitis. (Doc. 6-12, p. 19). While still hospitalized, Ms. Thompson underwent two more procedures to help with wound drainage. (Doc. 6-12, pp. 26, 28). After a three-week stay, Huntsville Hospital discharged Ms. Thompson at the end of April 2014 with a peripherally inserted central catheter (PICC) line so that she could receive IV antibiotics for six weeks at home. (Doc. 6-9, p. 36; Doc. 6-12, p. 20).[8]

Ms. Thompson saw Dr. Pickett in early May 2014 and reported "feeling much better." (Doc. 6-16, p. 26). Ms. Thompson complained of numbness and tingling. (Doc. 6-16, p. 27). Dr. Pickett noted that she was neurologically intact. (Doc. 6-16, p. 28). Ms. Thompson's films "reveal[ed] good alignment and construct position." (Doc. 6-16, p. 28). Ms. Thompson followed up with Dr. Pickett later in May and reported that she was "feeling much better and having a good deal less pain." (Doc. 6-16, p. 25). Dr. Pickett performed a secondary closure of Ms. Thompson's back wound near the end of May. (Doc. 6-10, p. 29; Doc. 6-16, p. 20).

Ms. Thompson saw Dr. Pickett twice in June 2014 and reported numbness and tingling sensations. (Doc. 6-16, pp. 16, 20). Dr. Pickett noted during the earlier June visit that Ms. Thompson's wound was healing nicely without a "sign of

---

[8] A PICC "is a long, thin tube that goes into [a person's] body through a vein in [the] upper arm. The end of this catheter goes into a large vein near the heart." https://medlineplus.gov/ency/patientinstructions/000461.htm (last visited Aug. 8, 2019).

drainage or infection." (Doc. 6-16, p. 22). Ms. Thompson reported feeling very well. (Doc. 6-16, p. 22).

During the later June visit, Ms. Thompson indicated that she was "doing well" and walking daily. (Doc. 6-16, p. 16). Dr. Pickett prescribed Celebrex to address "aches and pains … from a musculoskeletal source." (Doc. 6-16, p. 18). Dr. Pickett reported that Ms. Thompson could return to work as a nurse. (Doc. 6-16, p. 18).

Ms. Thompson saw Dr. Johnson, a general physician, at the Lakeside Clinic in early June 2014. (Doc. 6-15, p. 26). Dr. Johnson reported that Ms. Thompson would be on the antibiotic Keflex permanently.[9] (Doc. 6-15, p. 26). Ms. Thompson had "no current complaints" and "hop[ed] to return to work in [the] next few weeks." (Doc. 6-15, p. 26). Dr. Johnson diagnosed Ms. Thompson with hyperlipidemia, abnormal LFTs, degenerative disc disease, glucose intolerance, tachycardia, staphylococcal meningitis, and bacterial infection. (Doc. 6-15, p. 29). Dr. Johnson recommended that Ms. Thompson exercise regularly. (Doc. 6-15, p. 29).

Ms. Thompson returned to Dr. Pickett in September 2014 with complaints of right leg and back pain after returning to work. (Doc. 6-16, p. 11). Dr. Picket described Ms. Thompson's pain this way:

> It has intensified and seems to be most severe over the left buttock. She has exquisite tenderness over the SI joint and that seems to be where the pain arises, but she also has pain over both greater trochanters,

---

[9] Keflex is an antibiotic "used to treat a wide variety of bacterial infections." https://www.webmd.com/drugs/2/drug-6859/keflex-oral/details (last visited Aug. 23, 2019).

probably has an element of trochanteric bursitis. The pain courses
down the posterior thigh, particularly on the left as well. She has some
subjective numbness that waxes and wanes in the legs as well. Her
strength appears to be good throughout, although she is antalgic, but
she can walk on her toes and heels.

(Doc. 6-16, p. 13).[10] Dr. Pickett opined that Ms. Thompson was suffering from

musculoskeletal pain and stated that Ms. Thompson "should probably take off work

and start a progressive exercise program." (Doc. 6-16, p. 14). Dr. Pickett indicated

that he would "recommend SI joint injections if [Ms. Thompson's] MRI does not

reveal any striking pathology." (Doc. 6-16, p. 14). [11] A September MRI revealed

that Ms. Thompson had "persistent and basically unchanged anterolisthesis of L5

upon S1 with a central disc protrusion present." (Doc. 6-11, p. 17).

Dr. Campbell examined Ms. Thompson at the Spine & Neuro Center in

October 2014. (Doc. 6-16, p. 87). Ms. Thompson complained of "low back pain

going into [her] hips[.]" (Doc. 6-16, p. 87). Ms. Thompson rated her pain as three

to four out of ten. (Doc. 6-16, p. 87).

Dr. Campbell reported that Ms. Thompson "returned to work in June 2014

and her pain increased in the left > right low back. This is constant and has improved

---

[10] Antalgic means "marked by or being an unnatural position or movement assumed by someone
to minimize or alleviate pain or discomfort (as in the leg or back)." https://www.merriam-
webster.com/medical/antalgic (last visited Aug. 7, 2019).

[11] "The SI [or sacroiliac] joint injection enables physicians to confirm that irritation or damage to
the SI joint is the source of [a person's] symptoms. This precise diagnostic tool is also a therapeutic
procedure, offering significant pain relief." https://treatingpain.com/treatment/si-joint-injection
(last visited Aug. 16, 2019).

a little with being out of work for the last month. . . . The pain is worse with driving and better with rest."  (Doc. 6-16, p. 87).  Dr. Campbell noted that Ms. Thompson had an antalgic gait without an assistive device, decreased and painful range of motion of her lumbar spine, tender bilateral sacroiliac joint and bilateral greater trochanteric bursa, and decreased sensation in her left lateral leg below her knee. (Doc. 6-16, p. 89).  Dr. Campbell scheduled Ms. Thompson for diagnostic and therapeutic bilateral SI joint injections, which Ms. Thompson received in November 2014.  (Doc. 6-16, p. 89; Doc. 6-10, p. 27).

Ms. Thompson returned to Dr. Pickett in March 2015.  (Doc. 6-16, p. 5).  Ms. Thompson reported a "severe pop in her back that resulted in [an] inability to walk." (Doc. 6-16, p. 5).  Ms. Thompson stated that her condition had improved over the past two weeks.  (Doc. 6-16, p. 5).  Ms. Thompson reported being "overall better since taking off work the last six months on long-term disability."  (Doc. 6-16, p. 5). Dr. Pickett stated that Ms. Thompson "is now one year out from her injury and is doing relatively well."  (Doc. 6-16, p. 7).  Dr. Pickett noted that Ms. Thompson has "chronic back pain and probably always will to some degree."  (Doc. 6-16, p. 7). Dr. Pickett recommended that Ms. Thompson begin to exercise to help with discomfort.  (Doc. 6-16, p. 7).

In March 2015, Ms. Thompson began treatment at Tennessee Valley Pain Consultants and saw Ms. Durham, a licensed practical nurse.  (Doc. 6-17, pp. 14,

17).  Ms. Durham collaborated with Dr. Collins, a pain doctor at Tennessee Valley Pain Consultants, regarding Ms. Thompson's case.  (Doc. 6-17, p. 22).  Dr. Collins reviewed and signed the treatment record.  (Doc. 6-17, pp. 22-23).[12]

Ms. Durham reported that Ms. Thompson had an ataxic gait, moderately decreased range of motion of her trunk, mild generalized weakness of her lower left and right extremities, bilateral lumbosacral paraspinal tenderness, and increased pain with hyperextension, lateral rotation and side bending.  (Doc. 6-17, p. 20).[13]  Ms. Thompson's straight leg test was positive.  (Doc. 6-17, p. 20). [14]  Ms. Thompson's diagnoses included:  chronic pain due to trauma; degenerative disc disease; chronic low back pain; and lumbar spondylosis.  (Doc. 6-17, p. 22).[15]

---

[12] Because Ms. Thompson filed her claim before March 27, 2017, the regulations provide that Ms. Durham is not an acceptable medical source.  20 C.F.R. § 404.1502(a)(7).  Dr. Collins is an acceptable medical source.

[13] "Ataxia is typically defined as the presence of abnormal, uncoordinated movements. . . . An unsteady, staggering gait is described as an ataxic gait because walking is uncoordinated[.]" https://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/ataxia/conditions/index.html (last visited Aug. 7, 2019).  "The paraspinal muscles are the 'action' muscles of the back." https://www.verywellhealth.com/paraspinal-muscles-297191 (last visited Aug. 28, 2019).

[14] Examiners use the straight leg raise test to evaluate patients "with low back pain and nerve pain that radiates down the leg."  https://www.ebmconsult.com/articles/straight-leg-raising-test (last visited Aug. 9, 2019).

[15] "[T]he phrase 'spondylosis of the lumbar spine' means degenerative changes such as osteoarthritis of the vertebral joints and degenerating intervertebral discs (degenerative disc disease) in the low back."  https://www.emedicinehealth.com/spondylosis/article_em.htm (last visited Sept. 20, 2019).

Ms. Thompson reported a pain score of six out of ten during the March 2015 visit.  (Doc. 6-17, p. 14).  Ms. Thompson described her pain as "burning, stabbing in low back and down [bilaterally] into [the lower parts of her leg and] feet." (Doc. 6-17, p. 14).  Ms. Thompson indicated that sitting, bending, standing, and walking aggravated her pain; lying down and medication alleviated it.  (Doc. 6-17, p. 15).  Ms. Thompson reported that her pain level is three on a good day; ten on a bad day. (Doc. 6-17, pp. 14-15).

Ms. Durham noted that Ms. Thompson was walking daily for exercise and taking Percocet (10-325 mg tablet twice daily), diazepam (5 mg tablet once daily), and Ultram (50 mg tablet every six hours) for pain.  (Doc. 6-17, p. 17).  Ms. Durham indicated that Ms. Thompson was taking methocarbamol (750 mg tablet three times daily) and Zanaflex (4 mg tablet once nightly) for muscle spasms.  (Doc. 6-17, p. 17).[16]  Ms. Durham instructed Ms. Thompson to "[c]ontinue medications as prescribed" and "[l]imit activity to comfort and avoid activities that increase discomfort."  (Doc. 6-17, p. 22).

Dr. Arnold performed a consultative psychiatric evaluation of Ms. Thompson in early April 2015.  (Doc. 6-16, p. 93).  Dr. Arnold found Ms. Thompson's

---

[16] Methocarbamal "is a muscle relaxant used together with rest and physical therapy to treat skeletal muscle conditions such as pain or injury."  https://www.rxlist.com/robaxin-side-effects-drug-center.htm (last visited Aug. 23, 2019).  Baclofen "is used to treat muscle spasms caused by certain conditions (such as multiple sclerosis, spinal cord injury/disease)." https://www.webmd.com/drugs/2/drug-8615/baclofen-oral/details (last visited Aug. 23, 2019).

demeanor to be "composed and competent" and her behavior appropriate. (Doc. 6-16, p. 94). Dr. Arnold noted that Ms. Thompson was alert and oriented and had a stable mood. (Doc. 6-16, p. 94). Dr. Arnold reported that "Ms. Thompson's FSIQ is estimated low average/average range." (Doc. 6-16, p. 96).[17] Dr. Arnold recorded 54 as Ms. Thompson's global assessment of functioning score. (Doc. 6-16, p. 97). Dr. Arnold's notes reflect that Ms. Thompson reported that her ex-husband and her daughter handled everything around the house, but Ms. Thompson handled self-care and managed her long-term disability payments. (Doc. 6-16, p. 96). Dr. Arnold believed that the information that Ms. Thompson provided was reliable. (Doc. 6-16, p. 96).

Dr. Arnold diagnosed Ms. Thompson with opioid dependency and an adjustment disorder, not otherwise specified. (Doc. 6-16, p. 96). Dr. Arnold recorded "Opioid RX dependent '10 to 3'" as Ms. Thompson's pain level. (Doc. 6-16, p. 96).

Ms. Thompson returned to Tennessee Valley Pain Consultants later in April 2015 with a five as her pain level. (Doc. 6-17, p. 4). Ms. Thompson saw Ms. Durham during this visit; Dr. Collins signed the treatment notes later that afternoon.

---

[17] FSIQ stands for full scale intelligent quotient and measures a person's "complete cognitive capacity." https://www.special-learning.com/article/full_scale_intelligence_quotient_fsiq (last visited Aug. 23, 2019).

(Doc. 6-17, pp. 9, 13).  Ms. Thompson chiefly complained of "'sharp, burning'" low back and posterior pain.  (Doc. 6-17, p. 5).  Ms. Thompson indicated that sitting, bending, standing, and walking aggravated her pain; lying down and medication alleviated it.  (Doc. 6-17, p. 6).  Ms. Thompson's musculoskeletal system limitations were unchanged from her visit in March 2015.  (Doc. 6-17, p. 11).

During this visit, Ms. Thompson reported that Percocet was "helpful" for pain and received approval to take an additional tablet daily.  (Doc. 6-17, p. 9).  Ms. Thompson discussed having muscle spasms, and Ms. Durham recommended trying baclofen.  (Doc. 6-17, p. 9).  Dr. Collins authorized prescriptions for Percocet and baclofen.  (Doc. 6-17, p. 9).  Ms. Thompson's medications included:  Percocet (10-325 mg tablet with acetaminophen three times daily) for pain, methocarbamol (750 mg tablet three times daily) for muscle spasms associated with pain or injury, Diazepam (5 mg tablet twice daily) for pain, and baclofen (10 mg tablet nightly) for muscle spasms.  (Doc. 6-17, pp. 8-9).

In May 2015, Dr. Estock reviewed Ms. Thompson's work history, functional report, and medical records at the request of the Social Security Administration. (Doc. 6-4, p. 10).  Dr. Estock determined that Ms. Thompson suffers from the severe impairments of other fracture of bones, spine disorders, osteomyelitis, periostisis and other infections involving bone, diabetes mellitus, affective disorders and a non-severe anxiety disorder.  (Doc. 6-4, p. 9).  Dr. Estock reported that Ms. Thompson

is moderately restricted in daily activities, social functioning, and maintaining concentration, persistence, and pace. (Doc. 6-4, p. 9; *see also* Doc. 6-4, pp. 13-15).

Ms. Hope, an agency single decisionmaker, reviewed Ms. Thompson's records and provided a physical capacities assessment in May 2015. (Doc. 6-4, pp. 13, 11).[18] Ms. Hope found that one or more of Ms. Thompson's medically determinable impairments could reasonably be expected to produce pain or other symptoms. (Doc. 6-4, p. 11). Still, Ms. Hope determined that Ms. Thompson's statements about her (Ms. Thompson's) pain were "only partially credible as the severity alleged is not consistent with the evidence in [the] file." (Doc. 6-4, p. 11). Ms. Hope reported that Ms. Thompson could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; push or pull unlimitedly; occasionally stoop, kneel, crouch, and crawl; climb stairs and balance unlimitedly; and never climb ladders, ropes, or scaffolds. (Doc. 6-4, pp. 11-12). Ms. Hope noted that Ms. Thompson should avoid exposure to extreme cold and hazards, such as machinery, heights, and open bodies of water. (Doc. 6-4, p. 12).

---

[18] "In 1999, SSA launched the Single Decision Maker (SDM) program—authorizing disability examiners to process some cases without a medical consultant's sign off. The objective was to shorten the determination process, without degrading accuracy. . . . As part of the Bipartisan Budget Act of 2015, the Congress directed SSA to end Single Decision-Maker authority." https://www.ssab.gov/Details-Page/ArticleID/845/The-Single-Decision-Maker-Pilot-A-16-Year-Flight-and-Still-No-Clear-Landing (last visited Aug. 28, 2019).

In May 2015, Ms. Thompson returned to Tennessee Valley Pain Consultants and saw Ms. Durham. (Doc. 6-18, p. 69). Dr. Gantt, a pain doctor, signed the treatment record. (Doc. 6-18, p. 76). Ms. Thompson reported a pain score of five and described it as "'burning, throbbing, [and] pulsating'" in her "low back into bil[ateral] hips and down posterior legs to the ankles." (Doc. 6-18, p. 69).

Ms. Durham noted no changes in Ms. Thompson's degenerative disc disease and chronic lower back pain conditions. (Doc. 6-18, p. 75). Ms. Durham noted that "Dr. Pickett [did] not recommend steroid injections due to severity of infection." (Doc. 6-18, p. 73). Ms. Thompson was "doing well on current medications" and able to perform daily activities "with less difficulty." (Doc. 6-18, p. 73). Dr. Gantt authorized a refill of baclofen for Ms. Thompson's muscle spasms. (Doc. 6-18, p. 73).

In early July 2015, Ms. Thompson saw Dr. Johnson at the Lakeside Clinic complaining of moderate depression. (Doc. 6-17, p. 47). Ms. Thompson reported experiencing fatigue, feelings of isolation, insomnia, and increased pain. (Doc. 6-17, p. 47). Dr. Johnson assessed Ms. Thompson with fatigue, depression, abnormal LFTs, glucose intolerance, hyperlipidemia, folic acid deficiency, and vitamin B12 and D deficiencies. (Doc. 6-17, p. 49). Dr. Johnson prescribed Cymbalta for depression. (Doc. 6-17, p. 50).

Ms. Thompson saw Ms. Durham in mid-July 2015 and reported "burning, pulsating" pain in the middle of her lower back and down her posterior left lower extremity, including her foot. (Doc. 6-18, p. 60). Her pain level was a three out of ten. (Doc. 6-18, p. 60). Ms. Durham assessment of Ms. Thompson's problems did not change. (Doc. 6-18, pp. 66-67). Dr. Collins signed the treatment record. (Doc. 6-18, p. 68).

Ms. Thompson returned to Dr. Pickett in late July 2015 complaining of back and bilateral leg pain with more intensity on the left. (Doc. 6-17, p. 28). Dr. Pickett noted that Ms. Thompson's pain "came on two to three weeks ago without any antecedent injury." (Doc. 6-17, p. 30). Ms. Thompson's physical examination was normal. (Doc. 6-17, pp. 29-30, 31). Dr. Pickett initially detected some left leg weakness and difficulty walking on her toes and heals, but Ms. Thompson overcame those issues after encouragement. (Doc. 6-17, p. 31).

Dr. Pickett ordered a follow up MRI. (Doc. 6-17, pp. 31, 33). Dr. Armstrong, the radiologist, noted that Ms. Thompson had had eight spine surgeries through 2014. (Doc. 6-17, p. 33). Ms. Thompson had "[e]xtensive postsurgical fusion changes extending from the T11 to L3 as well as L5-S1[,]" "a broad-based disc herniation at L5-S1[,]" but "[n]o detrimental change from previous study" completed in September 2014. (Doc. 6-17, p. 33). Dr. Pickett found no "acute disc herniation or other areas of acute nerve root compression." (Doc. 6-17, p. 31). Dr.

Pickett referred Ms. Thompson to Dr. Anderson for an EMG of her lower extremities. (Doc. 6-17, p. 31).[19]

Dr. Anderson completed the EMG and nerve conduction study in August 2015. (Doc. 6-17, p. 24). Dr. Anderson found that Ms. Thompson had chronic left L5 radiculopathy and potentially a mild traumatic brain injury. (Doc. 6-17, p. 24).[20] Dr. Anderson indicated that Ms. Thompson had "fairly significant keloid formation" in the thoracic and lumbar spine. (Doc. 6-17, p. 26). Dr. Anderson noted that Ms. Thompson had decreased sensation in her left leg and significant decreased range of motion. (Doc. 6-17, p. 26). Dr. Anderson reported that Ms. Thompson was on medication that could impair her memory and problem solving ability. (Doc. 6-17, p. 26). Dr. Anderson noted, "I feel this patient is 100% medically disabled and cannot go back to productive employment." (Doc. 6-17, p. 26). Dr. Pickett concurred with Dr. Anderson's assessment that Ms. Thompson was "unable to return to productive employment." (*See* Doc. 6-17, p. 27).

Ms. Thompson visited Ms. Durham in September 2015 and reported a pain score of three. (Doc. 6-18, p. 50). Ms. Durham included the radiculopathy diagnosis

---

[19] An EMG or electromyography "measures muscle response or electrical activity in response to a nerve's stimulation of the muscle. The test is used to help detect neuromuscular abnormalities." https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/electromyography-emg (last visited Aug. 23, 2019).

[20] Radiculopathy is "a pinched nerve in the spine, [which] can lead to a variety of uncomfortable symptoms, including pain, weakness, and numbness." https://www.medicalnewstoday.com/articles/318465.php (last visited Aug. 23, 2019).

when describing Ms. Thompson's problems.  (Doc. 6-18, p. 57).  Ms. Dahlberg, a certified registered nurse practitioner, noted that Ms. Thompson was "doing well on current medication[,]" "function[ing] without side effects[,]" and "perform[ing] [daily activities] with less difficulty."  (Doc. 6-18, p. 55).  Dr. Collins signed the treatment record.  (Doc. 6-18, p. 58).

Ms. Thompson saw Dr. McCurdy at the Clinic for Vision in September 2015.  (Doc. 6-18, p. 77).  Ms. Thompson had a decrease in distance and near vision.  (Doc. 6-18, p. 77). Dr. McCurdy found a refractive error and diagnosed Ms. Thompson with optic nerve disorders and presbyopia (or farsightedness) in both of her eyes. (Doc. 6-18, p. 80).

Ms. Thompson returned to Ms. Durham in November 2015.  (Doc. 6-18, p. 41).  Ms. Thompson complained of low back, leg, and foot pain.  (Doc. 6-18, p. 41). Ms. Thompson reported a pain score of five.  (Doc. 6-18, p. 41).  Ms. Durham did not modify her assessments from Ms. Thompson's previous visit.   (Doc. 6-18, p. 48).   Ms. Thompson received instructions to "continue her medications as prescribed" and "limit activity to comfort and avoid activities that increase discomfort."  (Doc. 6-18, p. 48).  Dr. Collins signed the treatment record.  (Doc. 6-18, p. 49).

In December 2015, Ms. Thompson went to Tennessee Valley Pain Consultants with a pain score of seven.  (Doc. 6-18, p. 31).  Ms. Thompson reported

that "Percocet is not as effective or lasting as long." (Doc. 6-18, p. 35). In January 2016, Ms. Thompson saw Ms. Durham and complained of "burning, pulsating" pain in her lower back and down her legs. (Doc. 6-18, p. 22). Her pain was a level six. (Doc. 6-18, p. 22). A month later, Ms. Thompson reported a pain score of five and described it as "aching" in low back and "sharp" in her lower extremities (Doc. 6-18, p. 12). Ms. Thompson noted that her pain increased with changes in the weather. (Doc. 6-18, p. 16).

Ms. Thompson returned to Dr. McCurdy in March 2016. (Doc. 6-18, p. 82). Dr. McCurdy diagnosed Ms. Thompson with visual abnormalities and optic nerve disorders. (Doc. 6-18, p. 83).

In March 2016, Ms. Thompson reported a pain score of seven at Tennessee Valley Pain Consultants. (Doc. 6-18, p. 2). The pain began in her lower back, traveled down her leg, and ended with burning and throbbing in her foot. (Doc. 6-18, p. 2). She reported a pain level of three on her good days and ten on her bad days. (Doc. 6-18, p. 3). Ms. Thompson reported increased pain and stated that she stayed in bed most days. (Doc. 6-18, p. 6).

Ms. Thompson had a follow-up appointment with Dr. McCurdy in April 2016. (Doc. 6-18, p. 85). Dr. McCurdy diagnosed Ms. Thompson with "abnormal visually evoked potential [VEP]." (Doc. 6-18, p. 88).

Ms. Thompson returned to Tennessee Valley Pain Consultants in April, May, June, and August 2016. Ms. Thompson reported a pain score of seven and muscle spasms in April. (Doc. 6-19, pp. 97, 105). In May and June, her pain score was six. (Doc. 6-19, p. 107; Doc. 6-20, p. 4). Ms. Thompson was unsteady and reported walking for exercise. (Doc. 6-19, pp. 108, 110; Doc. 6-20, pp. 6, 8). During her June visit, Ms. Thompson's medications included a prescription for morphine sulfate (15 mg tablet; not to exceed three daily). (Doc. 6-20, p. 9). In August 2016, Ms. Thompson reported a pain score of four and had "burning" pain in her hips, which radiated down her legs. (Doc. 6-20, p. 15)

Ms. Thompson continued to visit Tennessee Valley Pain Consultants monthly from October 2016 to March of 2017. (Doc. 6-22, pp. 31-88). Ms. Thompson's pain level ranged from five to eight during these visits. (*See* Doc. 6-22, p. 80) (five in October 2016); (Doc. 6-22, p. 70) (six in November 2016); (Doc. 6-22, p. 60) (seven in December 2016); (Doc. 6-22, p. 50) (seven in January 2017); (Doc. 6-22, p. 41) (eight in February 2017); (Doc. 6-22, p. 31) (six in March 2017).

Ms. Thompson described her pain as "burning and pins and needles" "stabbing" and "all over aching." (Doc. 6-22, pp. 50, 60, 31). Ms. Thompson indicated that medication "takes the edge off." (Doc. 6-22, p. 64). Ms. Thompson's medications, physical examination, conditions, and patient instructions remained virtually unchanged throughout this period. (Doc. 6-22, pp. 31-88).

Dr. Collins referred Ms. Thompson to Dr. Janssen with SportsMed Orthapaedic Surgery & Spine Center in April 2017 because of left shoulder pain. (Doc. 6-22, pp. 102, 104). Dr. Janssen ordered an MRI to determine whether Ms. Thompson had torn her rotator cuff. (Doc. 6-22, p. 104). Dr. Armstrong, the radiologist, reported that Ms. Thompson had "mild hypertrophy with edema of the left AC joint," "partial-thickness tear at the superior surface of the supraspinatus tendon but no full-thickness rotator cuff tear," and "attenuation of the long head of the biceps tendon with poor visualization of its intra-articular portions." (Doc. 6-22, p. 101).

### 2. The ALJ's Assessment of Ms. Thompson's Records

In assessing Ms. Thompson's subjective symptoms, the ALJ indicated that he considered whether they "can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Doc. 6-3, p. 27). After summarizing Ms. Thompson's medical records, the ALJ found that the "clinical findings do not support the level of limitation alleged by the claimant and indicate that her treatment has been effective at controlling her symptoms." (Doc. 6-3, p. 29). The record does not contain substantial evidence to support this conclusion.

Ms. Thompson's consistent, long-term treatment with Dr. Pickett and medical providers at Tennessee Valley Pain Consultants objectively support her pain testimony. Ms. Thompson cannot receive steroid injections to manage her pain

because of the risk of infection. (Doc. 6-18, p. 73). Consequently, Ms. Thompson takes several prescribed medications to treat her pain, including Percocet (a narcotic), diazepam (the generic for Valium), morphine, and various muscle relaxers. (Doc. 6-18, p. 54). Even with treatment, Ms. Thompson routinely reported constant pain. *Somogy v. Comm'r, Soc. Sec. Admin.*, 366 Fed. Appx. 56 (11th Cir. 2010) (finding claimant's credibility bolstered by evidence showing she made numerous visits to her doctors, endured numerous diagnostic tests, and was prescribed numerous medications); *Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir. 1988) ("[T]he record is replete with evidence of a medical condition that could reasonably be expected to produce the alleged pain. No examining physician ever questioned the existence of appellant's pain. They simply found themselves unable to cure the pain.").

After her pinched spinal nerve diagnosis, Drs. Anderson and Pickett concluded that Ms. Thompson was unable to work. The ALJ discounted Dr. Anderson's statement as a conclusory, non-medical opinion and did not address Dr. Pickett's opinion. A doctor's statement that a claimant is "disabled" or "unable to work" is not a medical opinion under 20 C.F.R. § 404.1527(a)(1). *See* 20 C.F.R. § 404.1527(d). Consequently, neither Dr. Anderson's nor Dr. Pickett's statement concerning Ms. Thompson's ability to work is due controlling weight under 20 C.F.R. § 404.1527(c)(2). But Dr. Pickett's and Dr. Anderson's impressions about

Ms. Thompson's inability to work objectively support her pain testimony. There are no medical opinions that support the ALJ's finding that Ms. Thompson can perform light work. *See Graham v. Bowen*, 786 F.2d 1113, 1115 (11th Cir. 1986) (reversing because the ALJ substituted his lay opinion about the claimant's gait for the medical evidence showing more than a moderate limitation); *Storey v. Berryhill*, ___ Fed. Appx. ___, No. 17-14138, 2019 WL 2480135, at *8 (11th Cir. June 13, 2019) (citing *Graham* and observing that "it is generally improper for an ALJ to substitute his own judgment for that of a medical expert because ALJs are not medical experts").

The ALJ erred in failing to indicate the weight that he gave to Dr. Pickett's opinion. *See Kemp v. Astrue*, 308 Fed. Appx. 423, 426 (11th Cir. 2009) ("The ALJ must 'state specifically the weight accorded to each item of evidence and why he reached that decision.'") (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)). Contrary to the Commissioner's argument, the Court cannot assume that the ALJ would give Dr. Pickett's opinion the same weight assigned to Dr. Anderson's opinion, (Doc. 10, pp. 7-8), because Ms. Thompson saw Dr. Pickett over an extended period of time, and Dr. Pickett was familiar with her long-term treatment for pain. Dr. Anderson saw Ms. Thompson only once.

The ALJ focused on positive clinical notes for Ms. Thompson and did not discuss notes consistent with her pain testimony. *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (ALJ erred in "focusing upon one aspect of the evidence

and ignoring other parts of the record. . . . It is not enough to discover a piece of evidence which supports that decision, but to disregard other contrary evidence."). For instance, the ALJ observed Ms. Thompson's "normal range of motion in her upper extremities[,]" normal reflexes and sensation, "only mild generalized weakness in the right and left lower extremities." (Doc. 6-3, p. 29). The ALJ did not address Ms. Thompson's decreased range of motion of her trunk, positive left straight leg test, increased pain with hyperextension, lateral rotation and side bending, ataxic gait, and bilateral lumbosacral paraspinal tenderness. (Doc. 6-17, pp. 20-21); *cf. Chambers v. Astrue*, 671 F. Supp. 2d 1253, 1258 (N.D. Ala. 2009) (An ALJ "cannot pick and choose among a doctor's records to support his own conclusion.").

The ALJ reasoned that in May 2016, medication allowed Ms. Thompson to function without side effects and that "she was able to perform activities of daily living with less difficulty." (Doc. 6-3, pp. 21-22; Doc. 6-19, p. 112). But the ALJ's reliance upon this objective medical evidence to discredit Ms. Thompson's testimony omits key information which corroborates her pain testimony. During her May 2016 visit to Tennessee Valley Pain Associates, Ms. Thompson reported a level six "tight," "throbbing," and "burning" pain in her lower back and down into her foot. (Doc. 6-19, p. 107). Ms. Thompson had reported a level seven "tight," "sharp," and "burning" pain in the same areas during her previous visit. (Doc. 6-19, p. 107).

Ms. Thompson reported fatigue and depression. (Doc. 6-19, p. 108). Sitting, bending, standing, and walking aggravated Ms. Thompson's pain; lying down and taking medication alleviated it. (Doc. 6-19, p. 108). Ms. Thompson reported irregular pain ranging from a level three on good days and ten on bad ones. (Doc. 6-19, p. 108). Ms. Thompson reported walking for exercise and doing minimal housework. (Doc. 6-19, pp. 110, 112). Just two months earlier in March 2016, Ms. Thompson reported increased pain and stated that she stayed in bed most days. (Doc. 6-18, p. 6). The record from that March 2016 visit also states that medication kept Ms. Thompson functional without side effects and indicated that she was able to perform activities of daily living with less difficulty, though Ms. Thompson reported doing little housework. (Doc. 6-18, p. 7). The standard language in the TVPC records does not always align with Ms. Thompson's monthly reports regarding her pain and daily activities.

The fact that medication helps Ms. Thompson manage her pain does not mean that she can maintain work in a light job. *See Stricklin v. Astrue*, 493 F. Supp. 2d 1191, 1197 (N.D. Ala. 2007) ("That the plaintiff's medications were helping relieve his symptoms does not follow to the ALJ's conclusion that the plaintiff's symptoms were reduced to the point w[h]ere he could maintain full-time employment.") (alternation added). Thus, substantial evidence does not support the ALJ's finding

that Ms. Thompson's medical records undermine the credibility of her pain testimony.

### C.  Daily Activities

The ALJ indicated that Ms. Thompson's pain testimony was inconsistent with her daily activities.  (Doc. 6-3, p. 30); (*see also* Doc. 6-8, pp. 35-40).  The ALJ did not identify which activities he determined were inconsistent.  While an ALJ need not discuss "all portions of the function report," the ALJ must make it clear that he considered the claimant's condition "on the whole."  *Miles v. Comm'r, Soc. Sec. Admin.*, 652 Fed. Appx. 923, 927 (11th Cir. 2016); *see also Foote*, 67 F.3d at 1562 (If an ALJ rejects a claimant's subjective complaints, "the reasons should be expressed.").  Because the ALJ did not describe the basis for his opinion concerning Ms. Thompson's daily activities, the Court cannot verify whether he considered Ms. Thompson's activities completely. *Cf. Miles*, 652 Fed. Appx. at 927 ("The ALJ relied on portions of a function report Miles completed showing that he could prepare simple meals, do laundry, drive, shop in stores, pay bills, use a checkbook, and handle a savings account.") (citing *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) ("The ALJ's decision in this case was not a broad rejection and was sufficient to enable the district court and this Court to conclude the ALJ considered Mitchell's medical condition as a whole.")).

The vocational expert testified that employers would not tolerate Ms. Thompson's being off task more than 12 to 15 percent of the work day (including scheduled breaks) in the light and sedentary jobs identified. (Doc. 6-3, pp. 88-89). Additionally, Ms. Thompson would be unable to lie down outside of scheduled breaks. (Doc. 6-3, p. 89). Ms. Thompson's limited activities do not undermine her testimony that resting and lying down are part of her daily pain management schedule. And when crediting that evidence, Ms. Thompson's pain prevents her from complying with the break requirements described by the vocational expert. *See Foote*, 67 F.3d at 1562 (finding lifting and carrying objects up to ten pounds, performing light household chores, cooking, driving, shopping, and limited walking for exercise, bathing, dressing, and feeding are insufficient to show an ability to perform sedentary work in light of other daily activities significantly impacted by pain, including difficulty putting on a bra); s*ee also Holman v. Barnhart*, 313 F. Supp. 2d 1265, 1270 (N.D. Ala. 2004) (noting that the "ability to watch television for two hours in no way indicates an ability to work"). Consequently, substantial evidence does not support the ALJ's negative credibility finding.

## V.    CONCLUSION

The Court remands the Commissioner's decision for further administrative proceedings consistent with this memorandum opinion.

**DONE** this 24th day of September, 2019.

 

 

 

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE